JUDGE BUCHWALD

14 CV 6840

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                     :

ETHEL AUSTIN-SPEARMAN, individually    :    Case No.:
and on behalf of all others similarly situated,    :

                                  :    Date Filed:

         *Plaintiff,*               :

                                  :    Civil Action

    *v.*                                :

                                  :    Class Action Complaint and Demand

AMC NETWORK ENTERTAINMENT LLC, a    :    for Jury Trial
a New York limited liability company, and AMC  :
NETWORKS, INC., a Delaware corporation,    :

                                  :

         *Defendants.*            :

                                  :
-------------------------------------------------------------x

(stamp): RECEIVED  AUG 22 2014  U.S.D.C. S.D. N.Y. CASHIERS

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Ethel Austin-Spearman ("Austin-Spearman") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants AMC Network Entertainment LLC and AMC Networks, Inc. (collectively, "AMC" or "Defendants") to put an end to, and obtain redress for, their unlawful practice of disclosing consumers' sensitive information. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## NATURE OF THE ACTION

1.    Defendant AMC Networks, Inc. is a leading entertainment company that offers a variety of television programming through its eponymous cable television channel and websites, among other mediums. Defendant AMC Network Entertainment, LLC is a wholly owned subsidiary of AMC Networks, Inc.

1

2.      Visitors to the AMC website (www.amctv.com) are offered access to AMC's wide array of television programming, including its original series and reality shows.

3.      What the website's visitors aren't told, however, is that AMC discloses their personally identifiable information ("PII") along with a record of the video clips that they view (collectively, "Video PII") to third party Facebook. In addition to demonstrating a brazen disregard for its users' privacy rights, AMC's actions also violate the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), which prohibits the disclosure of video viewing records without a person's express written consent.

4.      AMC's violations of the VPPA are particularly flagrant here because the recipient of these disclosures is Facebook, which in its capacity as a data broker collects and maintains a vast database of consumers' highly detailed personal information. Facebook uses this unique dataset to develop comprehensive profiles about individual consumers' entire digital lives. These profiles may be used for targeted advertisings, sold as a commodity to other data brokers, or both.

5.      In an era when the collection and monetization of consumer data proliferates on an unprecedented scale, it's important that companies are held accountable for the exploitations of their users' sensitive information. AMC chose to disregard Plaintiff's and thousands of other users' statutorily protected privacy rights by releasing their sensitive data into the marketplace. Accordingly, Plaintiff brings this Complaint against AMC for its intentional and unlawful disclosure of her Video PII in violation of the VPPA.

## PARTIES

6.      Plaintiff Ethel Austin-Spearman is a natural person and citizen of the State of California.

2

7.      Defendant AMC Network Entertainment, LLC is a limited liability company existing under the laws of the State of New York, with its principal place of business located at 11 Penn Plaza, New York, New York 10001. AMC Network Entertainment, LLC conducts business throughout this District, the State of New York, and the United States.

8.      Defendant AMC Networks, Inc. is a corporation existing under the laws of the State of Delaware, with its principal place of business located at 11 Penn Plaza, New York, New York 10001. AMC Networks, Inc. conducts business throughout this District, the State of New York, and the United States.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as the action arises under the VPPA, which is a federal statute. This Court has personal jurisdiction over Defendants because their principal places of business are located in this District, they conduct business in this District, and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

10.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

### I.      A Brief Overview of AMC's Website.

11.      The AMC website offers visitors information about AMC's television programming, including movies and its original series, as well as the opportunity to watch video clips and episodes of many of AMC's television shows.

12.      Web users may access the website's content as a (i) guest, or (ii) by using an existing online account from certain participating cable television providers. AMC advertises

that only those users with a cable package including the AMC channel have access to full episodes of AMC's original programming. However, AMC occasionally offers promotions where users without a paid cable subscription may view certain of its programming for a limited time.

13.     Nowhere on the website, however, does AMC seek the consent of its users—paying and non-paying alike—to share or otherwise disclose their PII and video viewing records. Despite this, and as explained in <u>Section II</u> below, when a visitor clicks on a hyperlink to video clips on AMC's website, a record of the transaction (including the title of the video and information that personally identifies the individual), is sent to third party Facebook.

**II.     AMC Designed Its Website to Transmit Its Users' PII Along with Their Viewing Activity to Facebook.**

14.     The transmission of users' Video PII to Facebook's servers is accomplished using code developed by Facebook that operates on AMC's website. The following is a brief explanation of the technology and how AMC uses it.

> ***A.     An explanation of how companies implement Facebook's SDK on their websites.***

15.     Facebook is a third party social network that offers a Software Development Kit ("SDK")[1] that allows companies to add Facebook-related features to their websites. These features permit the company's website to interact with Facebook in various ways.[2] Examples include "Facebook Login," which lets visitors login to a website using their Facebook credentials, and "Facebook Social Plugins," which lets visitors use Facebook's, "Like," "Share,"

---

[1]     A Software Development Kit generally refers to a set of software development tools that allow computer programmers to develop applications that can interface with a specific software platform.

[2]     Facebook SDK for JavaScript, https://developers.facebook.com/docs/javascript (last visited June 9, 2014).

or "Comment" functions.

16.    Typically graphics are also added onto the webpage using Facebook's SDK. For instance, Figures 1 and 2 below show how the Facebook Login and Facebook Social Plugin graphics may appear on a website respectively.



(**Fig. 1.**)

(**Fig. 2.**)

17.    To make use of the SDK, a company must first add Facebook's source code to its website.[3] This code is customizable, and allows the company to choose which features to include (*e.g.*, Facebook Login or Social Plugins).

18.    The Facebook SDK also relies in part on cookies.[4] When a person visits a website using the SDK (*e.g.*, a webpage that includes a Facebook Social Plugin), the code attempts to force the visitor's web browser to check whether certain cookies exist on their computer.

19.    One of the cookies that Facebook's code forces the web browser to look for is "**c_user**," which contains the user's "Facebook ID." The Facebook ID is a unique numeric string assigned by Facebook to a specific user when their account is first created. This string may be inputted into a web browser to view an individual's "profile" page, thus making it a personal

---

[3]    Quickstart: Facebook SDK for JavaScript, https://developers.facebook.com/docs/javascript/quickstart/v2.0 (last visited May 28, 2014).

[4]    A cookie is a simple text file placed onto a user's computer that can be used to track browsing activity and report said activity back to the server that originally placed the cookie.

identifier.[5]

20.     The "**c_user**" cookie is placed onto a person's computer when first logging in to Facebook. A checkbox on Facebook's main login screen reads, "Keep me logged in." (*See* Figure 3 below). The "**c_user**" cookie remains on the computer of users who select this checkbox, regardless of whether they close their web browser.



(**Fig. 3.**)

21.     When a person visits a webpage that includes the SDK, Facebook's code causes their web browser to create a connection with Facebook's servers. Once connected, and depending on the Facebook SDK configuration chosen by the website's owner, data about the user's web browsing may be silently transmitted back to Facebook.

22.     In AMC's case, it chose to transmit the visitor's Facebook ID, as well as the title of the video viewed by the individual.

**B.      *AMC configured its website to send users' Video PII to Facebook.***

23.     The AMC website uses Facebook's SDK and embeds the Facebook "Like" and "Share" Social Plugins on its pages (circled in red in Figure 4, on the following page).

---

[5]     For example, a Facebook ID may be plugged into a web browser using the following URL to access a person's individual Facebook profile: http://www.facebook.com/profile.php?id=<Facebook ID>.



**(Fig 4.)**

24.     When a person views video clips on AMC's website, the Facebook SDK automatically loads and the AMC website initiates a transmission to Facebook that includes the value "www.amctv.com" and the visitor's Facebook ID from the "**c_user**" cookie on their computer.

25.     On AMC's website are hyperlinks to various sub webpages offering, among other things, video clips of its programming. As the user clicks on these hyperlinks, the Facebook SDK loads a Social Plugin (in particular, the "Like" and "Share" buttons) as the target webpage loads. Next AMC initiates a transmission to Facebook called "/plugins/like.php?" which contains values from the "**c_user**" cookie and full URL of the video's webpage, as illustrated in Figure 5.



**(Fig. 5.)**

26.     As a result of these data transmissions, Facebook receives a full record of: (i) the Facebook ID of the visitor browsing AMC's website, along with (ii) the exact titles of the audiovisual material (*i.e.*, the video clips) that they viewed. These actions represent serious invasions of AMC users' privacy, as detailed in Section III below.

**III.     The Privacy Hazards Posed by AMC's Unlawful Disclosures of Its Users' PII to Facebook.**

*A.     Facebook and other data brokers targets consumers based on their digital behavior.*

27.     An entire industry is now devoted to the collection and commercialization of consumer data.[6] Companies in this industry—known as data brokers—develop, share, and sell comprehensive profiles containing details about every aspect of individuals' digital lives.

28.     A Senate Committee hearing on Online Advertising and Hidden Hazards to Consumer Security and Data Privacy recently addressed this issue. United States Senator Carl Levin noted that, "as consumers use the internet, profiles are being created based on what they read, what movies they watch, what music they listen to, on and on."[7]

29.     Although primarily recognized for its eponymous social network, Facebook is also a data broker.[8] With over 130 million users in the United States alone,[9] Facebook has

---

[6]     *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes*, Staff Report for Chairman Rockefeller (Dec. 18, 2013).

[7]     *Opening Statement of Senator Carl Levin Before Permanent Subcommittee on Investigations on Online Advertising and Hidden Hazards to Consumer Security and Data Privacy*. (May 15, 2014).

[8]     *Facebook Moves to Become World's Most Powerful Data Broker*, http://www.forbes.com/sites/parmyolson/2014/04/30/facebok-moves-to-become-the-worlds-most-powerful-data-broker/ (last visited May 28, 2014).

[9]     *Internet World Stats: Usage and Population Statistics*, http://www.internetworldstats.com/stats26.htm (last visited June 3, 2014).

exclusive access to an exorbitant amount of personal consumer data. This wealth of information feeds into an analytics and advertising platform that Facebook markets to clients across a wide spectrum of industries.

30.    Facebook is uniquely able to directly link the data they accumulate on individuals' digital behaviors with the additional personal data that it extracts from its users' Facebook accounts. When combined, this data reveals deeply personal information about a consumer, including their medical treatments and concerns, their religious practices, their sexual orientation, where they spend their time, who they communicate with, etc.[10]

31.    Not surprisingly, Facebook recently announced that it was going to start providing advertisers with access to the highly detailed data, including information about consumers' web browsing habits on third party websites like AMC's, which it collects from millions of consumers online.[11]

32.    When the VPPA was introduced, the late Senator Paul Simon noted that, "every day Americans are forced to provide to business and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes."[12] Senator Patrick Leahy, one of the original drafters of the VPPA, also remarked that, "the trail of information generated by every transaction that is now recorded and stored in

---

[10]    *Protecting Consumer Privacy in a Big Data Age*, Federal Trade Commission Chairwoman Edith Ramirez, The Media Institute (May 8, 2014).

[11]    Chris Morran, *Facebook Is Now Selling Your Web-Browsing Data To Advertisers*, The Consumerist (June 12, 2014), *available at* http://consumerist.com/2014/06/12/facebook-is-now-selling-your-web-browsing-data-to-advertisers/; *see also* Facebook, *Making Ads Better And Giving You More Control*, *available at* https://www.facebook.com/help/585318558251813?ref=notif&notif_t=oba (last visited June 16, 2014).

[12]    S.Rep. No. 100-599 at 7–8 (1988).

sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."[13]

33.     While these statements rang true in 1988 when the act was passed, the need for legislation like the VPPA in the modern computing era is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized this point, saying that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[14]

34.     Likewise, Senator Al Franken summed up the importance of the VPPA in today's world as follows: "[i]f someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[15]

35.     These concerns are further here as the video viewing records here are personal and may remain stored in databases for an indefinite period of time.

**IV.     Plaintiff Austin-Spearman's Video PII Was Disclosed by AMC to Facebook Without her Permission.**

36.     Plaintiff Austin-Spearman has been a member of Facebook's social network since

---

[13]     *Id.* at 8.

[14]     The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, *available at* http://www.judiciary.senate.gov/hearings/hearing.cfm?id=f14e6e2889a80b6b53be6d4e412d460f

[15]     *Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century*, franken.senate.gov (Jan. 31, 2012), *available at* https://www.franken.senate.gov/?p=hot_topic&id=1923.

late 2007. Since then, Plaintiff has frequently accessed her Facebook account through her web browser and clicked the "Keep me logged in" button when signing into the account.

37.     Starting in 2013, Austin-Spearman began visiting the AMC website to, among other things, watch video clips of AMC's The Walking Dead television show.

38.     At all relevant times, Austin-Spearman did not consent, agree or otherwise permit AMC to disclose her Video PII to any third party companies.

39.     Likewise, Austin-Spearman has never been given the opportunity to prevent AMC from disclosing her Video PII to third parties.

40.     Nevertheless, when Austin-Spearman viewed video clips using the AMC website, AMC disclosed her Video PII—including her personally identifiable Facebook ID as well as the titles of the videos she viewed—to the third party social network and data broker Facebook.

## CLASS ALLEGATIONS

41.     **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of herself and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who (i) used the AMC website to watch videos, (ii) had their PII and video viewing records transmitted to Facebook, and (iii) for whom AMC did not have a record of express written consent to disclose the same.

Excluded from the Class are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entity's current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the Class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and

assigns of any such excluded person.

42.     **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals. Class members can be easily identified through Defendants' records.

43.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

        a)    Whether Defendants, through the AMC website, unlawfully disclosed and continue to unlawfully disclose their users' PII, including their video viewing records, in violation of 18 U.S.C. § 2710(b);

        b)    Whether Defendants' disclosures were committed knowingly; and

        c)    Whether Defendants disclosed Plaintiff's and Class members' PII without Class members' express written consent.

44.     **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiff and the Class.

45.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interest of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial

resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Class.

46.     **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

47.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and

13

provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

48.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and discovery.

**FIRST CAUSE OF ACTION**
**Violation of 18 U.S.C. § 2710**
**(On behalf of Plaintiff and the Class)**

49.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

50.     Defendants are "video tape service providers" as defined by the VPPA because they "engage in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery or prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), by providing video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via the AMC website.

51.     Plaintiff is a "consumer" as defined by the VPPA because she watched videos using the AMC website. 18 U.S.C. § 2710(a)(1). Under the Act, this means that she was a "subscriber" of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

52.     While surfing the AMC website on her computer, Plaintiff viewed numerous videos, including video clips of the television show The Walking Dead. On information and belief, during these occasions, the AMC website caused Plaintiff's Video PII—including her Facebook ID and records of the videos that she viewed—to be sent to Facebook.

53.     AMC's transmissions of Plaintiff's Video PII to Facebook constitute "knowing[]" disclosures" of Plaintiff's "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

54.     Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The definition's usage of the word "includes" means that a more expansive reading of the term was expressly contemplated.

55.     The National Institute of Standards and Technology (NIST) defines "personally identifiable information" as "any information that can be used to distinguish or trace an individual's identity."[16] As described in detail in Section II above, Plaintiff's PII transmitted to Facebook from the AMC website can be used to distinguish or trace her identity.

56.     At no time did Plaintiff ever provide AMC with any form of consent—either written or otherwise—to disclose her Video PII to third parties.

57.     Nor were AMC's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, AMC's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership." 18 U.S.C. § 2710(a)(2).

58.     As a result of Defendants' unlawful disclosures, Plaintiff and the Class have had their statutorily defined right to privacy violated. Plaintiff seeks an injunction to prohibit AMC from releasing her and the Class's Video PII in the future, as well as the maximum statutory and punitive damages available under the VPPA. 18 U.S.C. § 2710(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ethel Austin-Spearman on behalf of herself and the Class,

---

[16]     NIST Guide to Protecting the Confidentiality of Personally Identifiable Information (PII), http://csrc.nist.gov/publications/nistpubs/800-122/sp800-122.pdf (last visited Jan. 20, 2014).

respectfully requests that this Court enter an order:

      A.      Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Ethel Austin-Spearman as representative of the Class, and appointing her counsel as Class Counsel;

      B.      Declaring that Defendants' actions, as set out above, violate the VPPA, 18 U.S.C. § 2710;

      C.      Awarding injunctive and other equitable relief as necessary to protect the interests of the Class, including, *inter alia*, an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

      D.      Awarding damages, including statutory damages of $2,500 per violation, and punitive damages, where applicable, in an amount to be determined at trial pursuant to the VPPA, 18 U.S.C. § 2710(c);

      E.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

      F.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

      G.      Awarding such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

//

//

//

Respectfully submitted,

**ETHEL AUSTIN-SPEARMAN**, individually and
on behalf of all others similarly situated,

Dated: August 21, 2014

By: _____
    Matthew Wurgaft, Esq.

Matthew Wurgaft (MW1734)
mattwurgaft@gmail.com
KRAVIS & FILE, P.C.
1 Meadowlands Plaza, Suite 200
East Rutherford, New Jersey 07073

Rafey S. Balabanian*
rbalabanian@edelson.com
Benjamin S. Thomassen*
bthomassen@edelson.com
Alicia E. Hwang*
ahwang@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought.

*Counsel for Plaintiff and the Putative Class*