# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

ETHEL AUSTIN-SPEARMAN, individually and on behalf of all other similarly situated,

    *Plaintiff*,

v.

AMC NETWORK ENTERTAINMENT LLC, a New York limited liability company, and AMC NETWORKS, INC., a Delaware corporation,

    *Defendants*.

Case No.: 1:14-cv-06840 (NRB)

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Sandra D. Hauser
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 768-6802
Fax: (212) 768-6800
sandra.hauser@dentons.com

Natalie J. Spears (admitted *pro hac vice*)
Kristen C. Rodriguez (admitted *pro hac vice*)
DENTONS US LLP
233 S. Wacker Drive, Suite 7800
Chicago, IL 60606
Tel: (312) 876-8000
Fax: (312) 876-7934
natalie.spears@dentons.com
kristen.rodriguez@dentons.com

*Counsel for Defendants AMC Network Entertainment LLC and AMC Networks Inc.*

# TABLE OF CONTENTS

|  | Page(s) |
|---|---|
| BACKGROUND | 3 |
| ARGUMENT | 6 |
| I. Plaintiff Lacks Article III Standing To Bring Her Claim. | 6 |
| II. Plaintiff Fails To State A Claim Against AMC Because She Is Not A "Subscriber" Under The VPPA. | 11 |
| CONCLUSION | 14 |

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Wright*,
 468 U.S. 737 (1984) ............................................................................................................. 7

*Alston v. Countrywide Fin. Corp.*
 585 F.3d 753 (3d Cir. 2009) ................................................................................................. 8

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
 671 F.3d 140 (2d Cir. 2011) ................................................................................................. 6

*Arizona Christian Sch. Tuition Org. v. Winn*,
 131 S. Ct. 1436 (2011) ........................................................................................................ 10

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ............................................................................................................ 11

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................................................ 11

*BP Am. Prod. Co. v. Burton*,
 549 U.S. 84 (2006) .............................................................................................................. 12

*Clapper v. Amnesty Int'l*,
 133 S. Ct. 1138 (2013) ........................................................................................................ 10

*David v. Alphin*,
 704 F.3d 327 (4th Cir. 2013) ................................................................................................. 8

*Donoghue v. Bulldog Investors Gen. P'ship*,
 696 F.3d 170 (2d Cir. 2012) .................................................................................................. 8

*In re DoubleClick Privacy Litig.*,
 154 F. Supp. 2d 497 (S.D.N.Y. 2001) ................................................................................... 5

*Edwards v. First Am. Corp.*,
 610 F.3d 514 (9th Cir. 2010), *cert. dismissed as improvidently granted*,
 132 S. Ct. 2536 (2012) .......................................................................................................... 8

*Ellis v. Cartoon Network, Inc.*,
 No. 1:14-CV-484-TWT, 2014 WL 5023535 (N.D. Ga. Oct. 8, 2014) ......................... 9, 11, 13

*Fair Hous. Council v. Main Line Times*,
 141 F.3d 439 (3d Cir. 1998) .................................................................................................. 8

*In re Hulu Privacy Litig.*,
   No. C 11-03764, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ............................................. 11

*In re Hulu Privacy Litig.*,
   No. C 11-03764, 2014 WL 2758598 (N.D. Cal. June 17, 2014) ............................................. 11

*In re Hulu Privacy Litig.*,
   No. C 11-03674, 2013 WL 677379 (N.D. Cal. Dec. 20, 2013) ................................................. 9

*In re Hulu Privacy Litig.*,
   No. C 11-03764, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ............................................ 13

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2012) ...................................................................................................... 8

*Kendall v. Employees Ret. Plan of Avon Products*,
   561 F.3d 112 (2d Cir. 2009) ..................................................................................................... 7

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................................... 6, 7, 10

*New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
   980 F. Supp. 2d 527 (S.D.N.Y. 2013) ...................................................................................... 6

*In re Nickelodeon Consumer Privacy Litig.*,
   MDL 2443, 2014 WL 3012873 ........................................................................................... 9, 11

*Perrin v. U.S.*,
   444 U.S. 37 (1979) ................................................................................................................. 12

*Raines v. Byrd*,
   521 U.S. 811 (1997) ................................................................................................................. 7

*Rolon v. Henneman*,
   517 F.3d 140 (2d Cir. 2008) ................................................................................................... 11

*Sierra Club v. Morton*,
   405 U.S. 727, 92 S. Ct. 1361 (1972) ........................................................................................ 7

*Sterk v. Redbox*,
   No. 13-3037 (7th Cir. Oct. 23, 2014) ....................................................................................... 8

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................................................................. 6

**Statutes**

18 U.S.C. § 2710 .................................................................................................................. *passim*

**Other Authorities**

S. Rep. No. 100-599 (1988) ................................................................................................................3

Defendants AMC Network Entertainment LLC and AMC Networks Inc. (collectively "AMC") respectfully submit this Memorandum of Law in support of their Motion to Dismiss the putative Class Action Complaint of Plaintiff Ethel Austin-Spearman, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff Ethel Austin-Spearman brings a specious Complaint against AMC in this case, claiming to be a "subscriber" of AMC, and alleging that AMC violated the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.* (the "VPPA") by "knowingly" disclosing her "personally identifying information" to a third party, Facebook. According to her Complaint, Plaintiff is a long-time user of the social network Facebook, who decided to stay logged into her Facebook account while she visited other websites. One site she claims to have surfed was amctv.com, where she alleges she watched clips from the AMC television network's hit show, "The Walking Dead." Plaintiff does not allege that she registered or otherwise signed up *with* AMC in any way—nor does she claim that AMC knows her identity as a result of her "surfing the AMC website on her computer," or that AMC even knows she was on the site (nor can she so allege, since AMC has none of this information). Instead Plaintiff alleges that as a result of her decision to stay logged into her Facebook account, *Facebook* placed a "cookie" on her computer's browser, and that while she visited AMC's site, the "*Facebook* code" installed on AMC's site, which enabled AMC website visitors to "like" and "share" certain portions of the site, caused her browser to "transmit" her Facebook user ID from the Facebook cookie to Facebook, along with the URL of the web page she visited at AMC.

Based on these allegations, Plaintiff attempts to assert a claim against AMC under the VPPA. Plaintiff's claim fails.

The VPPA was enacted in 1988 following the publication of Judge Robert Bork's video rental history in a Washington newspaper. The Act prohibits a "video tape service provider" from "knowingly" disclosing "personally identifiable information" ("PII") of a "renter, purchaser or subscriber." 18 U.S.C. §§ 2710(a)(1); (b)(1). Under the Act, PII is information that, without more, identifies both a specific person and the specific video material that person viewed. 18 U.S.C. § 2710(b)(1). Despite the Complaint's artful, but inaccurate, pleading about AMC's supposed "initiation" of a "transmission" of PII, the reality is that AMC never even had Plaintiff's PII—let alone "knowingly" disclosed PII to Facebook as a "video tape service provider."

However, before even reaching these serious factual and legal flaws with Plaintiff's claim, fundamental flaws with the Complaint on its face require dismissal at this juncture. AMC addresses these Rule 12(b)(1) and Rule 12(b)(6) issues in this Motion. Not only does Plaintiff fail Article III's threshold standing test, but Plaintiff also does not come within the definition of a "consumer" under the VPPA with a potential right to bring a claim against AMC, and thus fails to state a claim as a matter of law.

First, Plaintiff lacks standing under Article III to pursue her claims because she has failed to allege that she suffered any injury in fact, much less injury at the hands of AMC. Plaintiff does not allege that she was harmed or made worse off in any concrete or particularized way whatsoever. At most, Plaintiff has attempted to allege disclosure of her PII based on the alleged actions of non-party Facebook coupled with her own speculation about what Facebook does with her information, which conduct she claims *together* amounts to a violation of the VPPA. Well-established Supreme Court and Second Circuit precedent do not allow such speculative, no-injury claims against a defendant to stand in federal court under Article III.

Second, Plaintiff's own allegations, even if true, show that she cannot meet a fundamental element for a VPPA claim. The plain language of the VPPA requires that the plaintiff be a "consumer," which the Act expressly defines as a "renter, purchaser, or subscriber" of a videotape service provider. Although Plaintiff tries to call herself a "subscriber" of AMC, her own allegations show that she is not a subscriber under any common meaning of that term— she has not registered or logged in with AMC for its free website; she has no user-ID or established profile with AMC; she has not downloaded anything from AMC; and she does not allege (nor could she) that AMC even knows her identity, her Facebook ID or anything at all about her. In short, Plaintiff has no relationship with AMC as contemplated by the VPPA; she merely visited AMC's website (a fact that AMC itself lacks sufficient information to confirm). That is not enough to state a VPPA claim, and to allow this Complaint to stand would stretch the VPPA well beyond its intended reach by creating potential liability where a computer user simply surfs the Internet and visits websites containing some form of video content, even though the site owner does not even know the user's identity.

For all of these reasons, Plaintiff's Complaint should be dismissed with prejudice.

## BACKGROUND

***The Video Privacy Protection Act.*** The VPPA was enacted in 1988 in direct response to the publication of United States Supreme Court nominee Judge Robert Bork's video rental history in a Washington, D.C. newspaper during his nomination hearings. S. Rep. No. 100-599, at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342, *available at* 1988 WL 243503. The purpose of the VPPA was to prevent such public disclosure by a videotape service provider of a person's PII—information that identifies 1) a specific person plus 2) the specific video material that person viewed. 18 U.S.C. § 2710(b)(1).

***Defendant AMC.***  According to the Complaint, Defendant AMC Networks Inc. is a "leading entertainment company that offers a variety of television programming through its eponymous cable television channel and websites. . . ." (Compl. ¶ 1.)  Defendant AMC Network Entertainment LLC is a wholly owned subsidiary of AMC Networks.  (*Id.*)  AMC offers a "wide array" of television programming, including its critically-acclaimed "original series and reality shows," such as "The Walking Dead."  (*Id.* ¶¶ 2, 37.)  The AMC website, located at www.amctv.com (*id.* ¶ 24), "offers visitors information about AMC's television programming" and also offers "the opportunity to watch video clips and episodes of many of AMC's television shows" (*id.* ¶ 11).  Visitors to the AMC website may access video clips "as a guest" or "by using an existing online account from certain participating cable television providers."  (*Id.* ¶¶ 2, 12.)  According to the Complaint, "AMC advertises that only those users with a cable package including the AMC channel have access to full episodes of AMC's original programming" but occasionally promotions are offered in which users without such an account may view certain programming.  (*Id.* ¶ 12.)

***Plaintiff's Facebook Usage and Visits to the AMC Website***.  Plaintiff pleads that she has been a Facebook user since 2007 who has "frequently accessed her Facebook account" and has elected to remain signed into her account.  (*Id.* ¶ 36.)  She claims that since 2013, she "began visiting the AMC website to, among other things, watch video clips of AMC's The Walking Dead television show."  (*Id.* ¶ 37.)  Plaintiff does not allege that she established any sort of account with AMC or that she has any type of relationship with AMC beyond that of a website visitor.  Plaintiff does not even allege that AMC knew her identity, her Facebook user ID, or anything else about her.

***Non-party Facebook.*** Facebook is a "third party social network" that "allows companies to add Facebook-related features to their websites." (*Id.* ¶ 15.) As is a common practice for all types of websites, AMC added the Facebook features of "like" and "share" to its website by installing the "code developed by Facebook" on AMC's website. (*Id.* ¶ 14.) According to Plaintiff's allegations, when a Facebook user signs into her Facebook account, Facebook places a "cookie" containing the user's Facebook ID on the user's computer's browser, and that cookie remains on the user's browser when the user elects to stay logged into Facebook while browsing other websites. (*Id.* ¶¶ 19-20.)[1] Plaintiff further alleges that when a Facebook user, who elects to stay signed into Facebook, visits websites that have the Facebook code installed, like AMC's site, "Facebook's code causes their web browser to create a connection with Facebook's servers" during which "data about the user's web browsing may be silently transmitted back to Facebook." (*Id.* ¶ 21.)

***The Alleged Disclosures by AMC.*** Plaintiff claims that she visited the AMC website while electing to stay logged into Facebook, and that as a result of the Facebook code installed on AMC's website, she believes AMC "initiate[d] a transmission to Facebook" that "contain[ed] values from the [Facebook cookie containing Plaintiff's Facebook ID] and full URL of the video's webpage." (*Id.* ¶¶ 25, 36, 37, 40.) Based on the alleged "transmission" of the Facebook cookie and URL information, Plaintiff alleges that Facebook received PII in the form of her Facebook ID and the "exact titles of the audiovisual material (*i.e.*, the video clips)." (*Id.* ¶ 26; *see also* ¶ 40). This alleged "initiation" of the "transmission of PII" by AMC, which she pleads

---

[1] According to the Complaint, a "cookie is a simple text file placed onto a user's computer that can be used to track browsing activity and report said activity back to the server that originally placed the cookie [i.e., Facebook]." (Compl. ¶ 18 n.4.) *See also In re DoubleClick Privacy Litig.*, 154 F. Supp. 2d 497, 503 (S.D.N.Y. 2001) ("Cookies are computer programs commonly used by Web sites to store useful information such as usernames, passwords, and preferences, making it easier for users to access Web pages in an efficient manner.").

on "information and belief," is the basis for her one-count VPPA claim. (*Id.* ¶ 52.) Notably, Plaintiff does not allege what Facebook does with this information it allegedly received from AMC, but she speculates that Facebook uses it for advertising and sales purposes. (*Id.* ¶ 4). Plaintiff does not allege any specific harm has befallen her as a result of the alleged transmission. Rather, she alleges that she "and the Class have had their statutorily defined right to privacy violated." (*Id.* ¶ 58.)

## ARGUMENT

### I. Plaintiff Lacks Article III Standing To Bring Her Claim.

Lack of standing is a threshold basis for dismissal under Rule 12(b)(1). *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 142–43 (2d Cir. 2011); *New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 980 F. Supp. 2d 527, 532 (S.D.N.Y. 2013). To establish Article III standing, a plaintiff bears the burden of establishing that she suffered (1) "an injury in fact, which is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" (2) "a causal connection between the injury and the conduct complained of;" and (3) "a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

To begin, Plaintiff lacks the first critical element of Article III standing: an injury in fact. Plaintiff does not allege she suffered any concrete or particular injury of any kind—be that economic, bodily or some other type of injury—as a result of the alleged disclosures. Instead, Plaintiff asserts that AMC allegedly violated a statute, without alleging facts that show any actual underlying, injury as a consequence of that alleged violation. A purported statutory violation alone, without any facts supporting a claim of actual resulting injury, does not satisfy

Article III.  *Compare* Compl. ¶ 58 ("Plaintiff and the Class have had their statutorily defined right to privacy violated"), *with Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) ("[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."); *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").

This binding Supreme Court precedent makes it clear that a plaintiff must plead facts supporting injury beyond a statutory violation to meet the standing requirement of Article III. Although Congress may accomplish a "[s]tatutory broadening of the categories of injury that may be alleged in support of standing," it may not do so by "abandoning the requirement that the party seeking review must himself have suffered an injury." *Lujan*, 504 U.S. at 578 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972)).  In short, "Congress cannot erase Article III's standing requirements." *Raines*, 521 U.S. at 820 n.3.  Thus, because Congress cannot create the underlying injury by simply enacting a statute that creates legal obligations to an individual, an alleged violation of the VPPA alone cannot suffice for Article III standing.  A plaintiff may only enforce those "specific legal obligations whose violation works a direct harm" to her that is actual and concrete. *Allen v. Wright*, 468 U.S. 737, 761 (1984).

The Second Circuit follows these well-established precedents under Article III.  In *Kendall v. Employees Ret. Plan of Avon Products*, 561 F.3d 112 (2d Cir. 2009), the court rejected the argument that "either an alleged breach of fiduciary duty to comply with ERISA, or a deprivation of [the plaintiff's] entitlement to that fiduciary duty, in and of themselves constitutes an injury-in-fact sufficient for constitutional standing." *Id.* at 121.  The court reasoned that although "plan fiduciaries have a statutory duty to comply with ERISA," a plaintiff

cannot maintain a claim for breach of that duty without also "alleg[ing] some injury or deprivation of a specific right that arose from a violation of th[e] duty." *Id.*[2]

Other Circuits are in accord. *E.g.*, *David v. Alphin*, 704 F.3d 327, 338-39 (4th Cir. 2013) (refusing to find that the "deprivation of [a] statutory right . . . is sufficient to constitute an injury-in-fact for Article III standing" because that "conflates statutory standing with constitutional standing"); *Katz v. Pershing, LLC*, 672 F.3d 64, 79-80 (1st Cir. 2012) ("[A]n allegation that someone has failed to meet some legal requirement, without more, is insufficient to confer Article III standing. . . . [A]n injury in fact must also be alleged."); *Fair Hous. Council v. Main Line Times*, 141 F.3d 439, 443–44 (3d Cir. 1998) (plaintiff who was not actually deterred by discriminatory advertising lacked standing because "a violation of the Act does not automatically confer standing on any plaintiff, even one who holds the status of a private attorney general").

Notwithstanding these well-settled principles of the fundamental requirements of standing, certain courts outside of the Second Circuit have departed from this reasoning, and have held in cases brought under the VPPA and in other contexts that, at least under the circumstances of those cases, an allegation of a violation of certain federal statutory provisions in and of itself created Article III standing.[3] *See, e.g.*, *Sterk v. Redbox*, No. 13-3037 (7th Cir. Oct.

---

[2] The Second Circuit also has gone on to acknowledge that where "a plaintiff's claim of injury in fact depends on legal rights conferred by statute, it is the particular statute and the rights it conveys that guide the standing determination." *Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170, 178 (2d Cir. 2012).

[3] *See e.g.*, *Alston v. Countrywide Fin. Corp.* 585 F.3d 753, 763 (3d Cir. 2009) (finding that a "plaintiff need not demonstrate that he or she suffered actual monetary damages" to have Article III standing, but failing to acknowledge contrary precedents); *Edwards v. First Am. Corp.*, 610

23, 2014) (summarily finding Article III standing based solely on an allegation of a violation of the VPPA, but affirming judgment for defendant under the "ordinary course of business" exception to the statute).[4] A petition of certiorari is currently before the Supreme Court asking the Court to review whether those departures from the well-established requirements of standing comport with Article III's requirements. *See* Brief for Petitioner, *Spokeo v. Robbins*, No. 13-1339, 2014 WL 1802228, at *16–19 (May 2014) (noting potential impact on many statutes including VPPA).

AMC respectfully submits that any finding that an alleged statutory violation alone is sufficient to confer Article III standing is a departure from the Supreme Court's clear mandate, and improperly collapses the three-part standing question of injury in fact, causation, and redressability into a single question of redressability. Specifically, by excusing the plaintiff from showing injury in fact at the hands of a defendant, these courts have also improperly excused the plaintiff from showing the "causation" element as well. That is because where the only injury is a violation of legal duty that had no effect on the plaintiff (or at minimum, no effect attributable to the party she has sued), the defendant has caused nothing, and thus the "causal connection"

---

F.3d 514, 517 (9th Cir. 2010) (holding statutory violation alone satisfied Article III standing), *cert. dismissed as improvidently granted*, 132 S. Ct. 2536 (2012).

[4] *See also In re Nickelodeon Consumer Privacy Litig.*, MDL 2443 (SRC), 2014 WL 3012873, at *3–4 (D.N.J. Jul. 2, 2014) (dismissing on other grounds); *Ellis v. Cartoon Network, Inc.*, No. 1:14-CV-484-TWT, 2014 WL 5023535, at *2 (N.D. Ga. Oct. 8, 2014) (dismissing on other grounds); *In re Hulu Privacy Litig.*, No. C 11-03674, 2013 WL 677379, at *8–11 (N.D. Cal. Dec. 20, 2013). Notably, while finding standing based upon a similar misreading of the Supreme Court's precedent, each of these courts nonetheless rejected the asserted VPPA claims on the merits and/or on class certification (*id.*, *supra* and *infra* at n.5)— a fact which highlights the important gatekeeping role that the Article III standing doctrine plays. AMC respectfully submits that under well-established precedent, defendants and the courts should not bear the burden of litigating suits from the outset where no plaintiff alleges an actual injury in fact.

that is otherwise required is absolutely meaningless. *Arizona Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011) ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.'") (quoting *Lujan*, 504 U.S. at 560–61) (brackets omitted). Accordingly, to find that an allegation of injury sufficient to satisfy Article III is created when Plaintiff pleads she has "had [her] statutorily defined right to privacy violated" (Compl. ¶ 58) is to render the case or controversy of Article III an empty formality.

Further, the Supreme Court has also recently reiterated the importance of the injury-in-fact to be actual or imminent, and not conjectural or hypothetical. *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1141 (2013) (holding, inter alia, that mere hypothetical threat of future harm was insufficient to establish an injury). Here, however, Plaintiff has not pled any real threat of future harm by AMC's actions; in fact, she does not even allege that Facebook does anything with the data it allegedly collects from the AMC website. Instead, all she does is speculate that the data Facebook collects "*may* be used for targeting advertisings, sold as a commodity to other data brokers, or both." (Compl. ¶ 4.) There are no allegations that Plaintiff's data has or will be sold, or what, if any, harm will befall her from Facebook's alleged potential actions, and certainly no concrete, particularized harm. Plaintiff offers only speculation about theoretical, but unidentified and unknown, potential future uses of that information by Facebook. That does not establish an injury-in-fact under the Supreme Court's precedent. Nor do Plaintiff's allegations meet the causal requirement of Article III standing.

## II. Plaintiff Fails To State A Claim Against AMC Because She Is Not A "Subscriber" Under The VPPA.

Beyond the lack of standing, Plaintiff's VPPA claim fails as a matter of law on the face of the Complaint.[5] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires factual allegations sufficient to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations and "formulaic recitation[s]" are insufficient. *Twombly*, 550 U.S. at 555. Where the alleged facts "do not permit the court to infer more than the mere possibility of misconduct," the complaint has alleged—but it has not shown—that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679. Further, this Court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (Sotomayor, J.) (internal quotation marks omitted).

---

[5] Ultimately, Plaintiff's VPPA claim fails for numerous reasons not addressed in this Motion, including that there was no disclosure of PII by AMC in the first instance, much less a "knowing" disclosure by AMC. Further, there are serious questions as to whether AMC is even a "video tape service provider" as contemplated by the Act and whether a Facebook ID without more can constitute PII in this alleged context (AMC contends—and would ultimately show—that this is not PII here, nor was there any knowing disclosure as a matter of fact and law). *See, e.g.*, *In re Nickelodeon Consumer Privacy Litig.*, 2014 WL 3012873, at *10–13 (unique device identifier cannot be PII); *Ellis v. Cartoon Network, Inc.*, 2014 WL 5023535, at *3 (Android ID not PII); *In re Hulu Privacy Litig.*, No. C 11-03764, 2014 WL 1724344, at *11–17 (N.D. Cal. Apr. 28, 2014) (Hulu user ID not PII, but finding that "context" might render a Facebook ID capable of being PII). Should this case proceed (although it should not), at the appropriate juncture AMC would present to this Court the many flaws in Plaintiff's theory as well as the myriad reasons why no class can be certified in this case under Fed. R. Civ. P. 23. *See, e.g., In re Hulu Privacy Litig.*, No. C 11-03764, 2014 WL 2758598, at *12–16 (N.D. Cal. June 17, 2014) (rejecting class certification given the overwhelming ascertainability problems in even identifying users with potential claims).

Plaintiff's claim fails under Rule 12(b)(6) because, based on her own allegations, she is not a "consumer" as required to come within the VPPA. The VPPA defines a "consumer" as a "renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. 2710(a)(1). Plaintiff does not allege that she rented or purchased anything from AMC; instead, she labels herself a "subscriber" of AMC because she "surf[ed] the AMC website on her computer." (Compl. ¶¶ 51–52.) That does not constitute being a "subscriber" of AMC under any "ordinary meaning" of that term, which must be applied here because "subscriber" is not defined in the statute. *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) ("Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.") (citing *Perrin v. U.S.*, 444 U.S. 37 (1979)).

Plaintiff has not alleged, and cannot allege, any of the hallmarks of being an AMC "subscriber," as that term is commonly understood. *E.g. Merriam–Webster Online Dictionary* (defining "subscribe" as "to enter one's name for a publication or service; *also*: to receive a periodical or service regularly on order"; and "to pay money to get a publication or service regularly"); *Oxford Dictionaries* (defining "subscriber" as "[a] person who receives a publication regularly by paying in advance," or "[a] person who pays to receive or access a service"); *MacMillan Online Dictionary* ("someone who pays money in order to receive something regularly, for example copies of a newspaper or magazine, or a service").[6]

Plaintiff did not pay AMC to visit its free website; but even putting the lack of payment aside, she has no relationship with AMC. She never provided AMC with her name, nor does she allege she "signed up," registered, or established any personal user ID or profile with AMC.

---

[6] *See* http://www.merriam-webster.com/dictionary/subscriber; http://www.oxforddictionaries.com/us/definition/american_english/subscriber; http://www.macmillandictionary.com/dictionary/american/subscriber (all last visited Oct. 23, 2014).

Indeed, she does not even allege (nor could she allege) that AMC knows her identity or knows that she was on its website. *Compare* Compl. ¶ 37, *with Hulu*, 2012 WL 3282960, at *8 (N.D. Cal. Aug. 10, 2012) (holding the plaintiffs were Hulu "subscribers" where, even though the service was free, Plaintiffs further "signed up for a Hulu account, became registered users, received a Hulu ID, established Hulu profiles, and used Hulu's video streaming services").

Instead, according to Plaintiff's own allegations, she merely "visit[ed] the AMC website" (Compl. ¶ 37); there are not even allegations that she did so on a regular basis.[7] In fact, she can decide to never visit the AMC website ever again—and that decision will have zero consequences, costs, or further obligations. Even the *Hulu* court recognized that to be a subscriber, one must do more than just visit a website; but that is all that Plaintiff has alleged here. *Hulu*, 2012 WL 3282960, at *8; *c.f. Ellis v. Cartoon Network, Inc.*, 2014 WL 5023535, at *2 (finding plaintiff was "arguably a subscriber" when he "plead[] more than simply visiting a website" by alleging that he "downloaded [an] app and used it to watch video clips" and dismissing VPPA claim on other grounds).

The reality is that the VPPA necessarily presumes some sort of direct, ongoing relationship between the video tape service provider and the consumer.[8] That does not exist here, according to Plaintiff's own allegations. There is simply no precedent to support the notion

---

[7] In fact, while Plaintiff alleges that "web users may access [AMC's] content as a (i) guest, or (ii) by using an existing online account from certain participating cable television providers" (Compl. ¶ 12), Plaintiff does not allege which mode of access she used to view videos on the AMC site. Either way, it does not matter for purposes of determining whether Plaintiff is a "subscriber" to AMC or its website because Plaintiff does not, and cannot, allege any "subscriber" relationship *with AMC* or even that AMC knows who she is or what videos she watched.

[8] Notably, Plaintiff's inability to plead the threshold element of being a "subscriber" is further reflected in the anemic nature of her allegations on other elements of the statute. For example, the Complaint does not allege facts showing AMC even knows who Plaintiff is or *possessed* Plaintiff's Facebook ID in the first place, let alone that AMC *knowingly* disclosed it, as required by the statute. 18 U.S.C. § 2710(b)(1).

that someone who merely visits a website and views that website's offerings is a "subscriber". Finding that Plaintiff is a "consumer" under the VPPA would mean exactly that, and would stretch the Act far beyond its intended purpose—and its plain language. This Court should decline to do so.

**CONCLUSION**

For all of the foregoing reasons, Defendants AMC Network Entertainment LLC and AMC Networks, Inc. respectfully request this Court to dismiss the Complaint with prejudice.

Dated: October 23, 2014                    Respectfully submitted,


/s/ Sandra D. Hauser
Sandra D. Hauser
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel:  (212) 768-6802
Fax:  (212) 768-6800
sandra.hauser@dentons.com

Natalie J. Spears (admitted *pro hac vice*)
Kristen C. Rodriguez (admitted *pro hac vice*)
DENTONS US LLP
233 S. Wacker Drive, Suite 7800
Chicago, Illinois 60606
Tel:  (312) 876-8000
Fax:  (312) 876-7934
natalie.spears@dentons.com
kristen.rodriguez@dentons.com

*Attorneys for AMC Network Entertainment LLC and AMC Networks Inc.*