**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ETHEL AUSTIN-SPEARMAN, individually and on behalf of all other similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>AMC NETWORK ENTERTAINMENT LLC, a New York limited liability company, and AMC NETWORKS INC., a Delaware corporation,<br><br>*Defendants*. | **Case No.: 1:14-cv-06840 (NRB)**<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Sandra D. Hauser
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 768-6802
Fax: (212) 768-6800
sandra.hauser@dentons.com

Natalie J. Spears (admitted *pro hac vice*)
Kristen C. Rodriguez (admitted *pro hac vice*)
DENTONS US LLP
233 S. Wacker Drive, Suite 7800
Chicago, IL 60606
Tel: (312) 876-8000
Fax: (312) 876-7934
natalie.spears@dentons.com
kristen.rodriguez@dentons.com

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cohen v. JP Morgan Chase & Co.*,
   498 F.3d 111 (2d Cir. 2007)...........................................................................................5

*Donoghue v. Bulldog Investors General Partnership*,
   696 F.3d 170 (2d Cir. 2012)........................................................................................4, 5

*Eichenberger v. ESPN, Inc.*,
   No. C14-463 TSZ (W.D. Wa. Nov. 24, 2014)..............................................................8

*Ellis v. Cartoon Network*,
   No. 14-cv-484, 2014 WL 5023535 (N.D. Ga. Oct. 8, 2014) ....................................7, 8

*Gladstone Realtors v. Vill. of Bellwood*,
   441 U.S. 91 (1979)..........................................................................................................3

*In re Hulu Privacy Litig.*,
   No. C 11-03674 LB, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ........................6, 7

*In re Hulu Privacy Litig.*,
   No. C 11-03674 LB, 2014 WL 2758598, (N.D. Cal. Feb. 17, 2014) ............................7

*In re Hulu Privacy Litig.*,
   No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ..........................8, 9

*Kendall v. Employees Retirement Plan of Avon Prods.*,
   561 F.3d 112 (2d Cir. 2009)........................................................................................3, 4

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1982)........................................................................................................3

*In re Nickelodeon Consumer Privacy Litig.*,
   MDL 2443, 2014 WL 3012873 (D.N.J. July 2, 2014)...................................................8

*Organizacion Jd Ltda. v. U.S. Dep't of Justice*,
   124 F.3d 354 (2d Cir. 1997)...........................................................................................8

*Warth v. Seldin*,
   422 U.S. 490 (1975)........................................................................................................4

**Statutes**

Electronic Communications Privacy Act, 18 U.S.C. § 2702 .......................................................7, 8

Video Privacy Protection Act, 18 U.S.C. § 2710................................................................... passim

**Other Authorities**

http://www.oxforddictionaries.com/definition/english/arrange?q=arrange (last
    accessed Dec. 22, 2014)...........................................................................................................6

PRELIMINARY STATEMENT

Plaintiff's Response confirms that her Complaint should be dismissed. Beyond Plaintiff's lack of standing, which alone requires dismissal, Plaintiff's Response does nothing to save her complaint from its equally fundamental failing: she is not a subscriber to AMC under any reasonable understanding of that term, and therefore, she is not entitled to bring a claim under the VPPA. No court has found that a casual visitor to a website who watches videos on that site is a "subscriber" under the VPPA. Yet Plaintiff would have this Court hold exactly that. To find that Plaintiff is a "subscriber" would stretch the meaning of that term well beyond its plain meaning and certainly beyond Congress's intent. For the foregoing threshold reasons, Plaintiff's VPPA claim fails. Finally, while Plaintiff felt the need to defend the adequacy of her allegations that AMC "knowingly" transmitted "personally identifiable information" (or "PII") to Facebook, and that a Facebook ID is in fact PII, AMC has not raised those issues at this juncture; AMC simply pointed out that Plaintiff's claim not only fails to make it out of the gate, but would have serious and ultimately insurmountable hurdles down the road. AMC[1] respectfully requests that this Court dismiss Plaintiff's Complaint with prejudice.

ARGUMENT

I.      **Plaintiff Lacks Article III Standing.**

Plaintiff concedes that she has suffered no injury or damage or any actual harm as a result of AMC's alleged disclosure to Facebook of her Facebook ID and video webpage URL. She further concedes that her case does not rest on any future harm that might befall her from what Facebook might do with her information. In fact, Plaintiff is so unharmed by the alleged disclosure that she apparently has no qualms disclosing that she watched "The Walking Dead" in

---

[1] As in the Opening Brief, "AMC" will be used herein to collectively refer to the Defendants AMC Network Entertainment LLC and AMC Networks Inc.

a publicly available federal complaint without redaction.  Despite this clear admission that there

has been *no* invasion of any legally protected interest that Plaintiff has in keeping "private"

something she has herself publicly disclosed, and notwithstanding the lack of any harm to her,

Plaintiff still maintains that she is entitled to $2,500 under the VPPA, and that all of the class

members she seeks to represent are similarly entitled.  She urges this Court to find Article III

standing to sue based *solely* upon the charge that Plaintiff's "statutorily-granted right to the

privacy of her video viewing records" was violated by AMC.  (*See* Resp. at 5.)

AMC respectfully maintains that this type of lawsuit—a no factual injury lawsuit—has

no place in a federal courthouse under Article III.  The Supreme Court cases to which Plaintiff

refers as "decades" of authority for the point that a statutory violation, in the absence of any

actual injury, is sufficient to confer Article III standing, hold no such thing.  (*See* Resp. at 6.)

Plaintiff conflates cases in which the Court recognized that Congress had created a statutory right

of action to pursue a previously unrecognized type of injury, with a finding of a right to sue

when there has been *no injury at all*.  The Supreme Court itself addressed this critical distinction

in *Lujan*, explaining that a Court's recognition of a new cognizable legal remedy for *de facto*

injury, emanating from a statute, is fundamentally different than finding that Article III standing

can exist in the absence of injury altogether:

> Both of the cases used by *Linda R. S.* as an illustration of that principle [that
> "the . . . injury required by Art. III may exist solely by virtue of 'statutes
> creating legal rights, the invasion of which creates standing'"] involved
> Congress' elevating to the status of legally cognizable injuries concrete, *de
> facto* injuries that were previously inadequate in law (namely, injury to an
> individual's personal interest in living in a racially integrated community, and
> injury to a company's interest in marketing its product free from competition).
> As we said in *Sierra Club*, "[Statutory] broadening [of] the categories of
> injury that may be alleged in support of standing is a different matter from
> abandoning the requirement that the party seeking review must himself have
> suffered an injury." Whether or not the principle set forth in *Warth* can be

2

extended beyond that distinction, it is clear that in suits against the
Government, at least, the concrete injury requirement must remain.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1982) (quotations and citations omitted); *see*

*also Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 100 (1979) ("In no event . . . may

Congress abrogate the Art. III minima: A plaintiff must always have suffered a distinct and

palpable injury to himself . . . that is likely to be redressed if the requested relief is granted.")

(internal quotation omitted).

Plaintiff attempts to explain away the Supreme Court cases cited by AMC with the

sweeping and conclusory statement that "they fail to address the issue at hand," or are factually

distinguishable.  (Resp. at 9.)  The reality is that the specific standing question posed by this

lawsuit has not yet been squarely addressed by the Supreme Court.  In fact, as AMC pointed out

in its Opening Brief, a Petition of Certiorari is currently before the Supreme Court asking it to

review this very question in one of Plaintiff's attorneys' other cases, and the Supreme Court has

asked the Solicitor General to weigh in on the issue.  *Spokeo Inc. v. Robins*, 2014 WL 1802228.[2]

Although some lower court cases have found that Article III standing was satisfied in

VPPA cases under similar facts—as AMC fully noted in its Opening Brief—those courts are not

in the Second Circuit, and the question is one of serious debate, and one AMC is entitled to raise

and this Court is entitled to evaluate independently.  That is particularly true in view of the

Second Circuit's expressed unwillingness in other contexts to allow a non-injured plaintiff to

rely upon an alleged statutory violation alone to confer Article III standing.  *See Kendall v.*

---

[2] Indeed, Petitioner's brief in *Spokeo* and the amicus brief submitted by eBay, Facebook, Google,
and Yahoo!, specifically noted the potential impact of the case on many statutes, including the
VPPA, and further argued that had the matter been decided in the Second Circuit, it would have
had the opposite result based on *Kendall v. Employees Retirement Plan of Avon Prods.,* 561 F.3d
112 (2d Cir. 2009).  *See Spokeo* Petitioner Brief, 2014 WL 1802228 at *16–19; eBay *et al*.
Amicus Brief, 2014 WL 2582797, at *5-9.

*Employees Retirement Plan of Avon Prods.*, 561 F.3d 112 (2d Cir. 2009).   As AMC outlined in

its opening brief, in *Kendall*, the Second Circuit held, in the context of an ERISA claim, that

allegations of breach of statutory duties do not "in and of themselves constitute[] an injury-in-

fact sufficient for constitutional standing." *Id.* at 121.  The plaintiff in *Kendall* alleged a breach

by her employer of a statutorily-mandated fiduciary duty imposed by ERISA.  While recognizing

the statutory right of action, and while also recognizing the general principle that in certain

situations, the "actual or threatened injury required by Art. III may exist solely by virtue of

statutes creating legal rights, the invasion of which creates standing," *id.* at 118 (quoting *Warth v.

Seldin*, 422 U.S. 490, 500 (1975)), the Court rejected plaintiff's claim, because no actual injury

or harm was suffered by that plaintiff as a result of the alleged violation.  The law in this Circuit,

still, is that the existence of a statutory right of action alone does not eliminate the requirement of

injury-in-fact, and that a plaintiff "must still allege some injury in the form of a deprivation of a

right," contrary to what Plaintiff suggests.  *Id.* at 120.

    *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170 (2d Cir. 2012), in no

way commands a different result.  *Donoghue*, when read closely, merely reaffirms the principle

that Congress can define and create a legal cause of action to redress *de facto* injuries that

already existed, but where the remedies previously available under statutory or common law

were inadequate.  In *Donoghue*, the Court recognized plaintiff's actual injury—namely the injury

resulting from every violation of § 16(b) of the Securities Exchange Act of 1934, which prohibits

"short-swing" trading by certain corporate insiders—was damage to a corporate issuer's "interest

in maintaining a reputation of integrity, an image of probity" and "in insuring the continued

public acceptance and marketability of its stock." *Id.* at 177-78 (internal quotation omitted).  The

Court found that "[t]his interest is injured not only by actual insider trading, but by any trading in

4

violation of an insider's fiduciary duty, including the trading altogether prohibited by § 16(b)." *Id.* at 177-78. *Donoghue* thus was not a no-injury case, but rather a case where the plaintiff's actual injury would not have been recognizable at law, absent the new statutory right of action.

Here, however, there is no injury or actual invasion of any right alleged to have been suffered by Plaintiff from the purported disclosure to Facebook of the video watch pages URLs Plaintiff clicked on while logged into Facebook and Plaintiff's Facebook ID. In fact, many individuals click the "like" button to disclose and share video watch pages to their friends, family and the public. It is not somehow "inherently" injurious in the context pled where, according to Plaintiff's allegations, any disclosure to Facebook would have been the result of her *own* decision to remain logged into her Facebook account while she visited to the AMC website. As such, Plaintiff is more akin to the plaintiff in *Kendall*, with no actual injury. Thus, Plaintiff's complaint should be dismissed with prejudice for lack of Article III standing.

**II.      Plaintiff's Own Allegations Plainly Demonstrate She Is Not A Subscriber.**

Even assuming Plaintiff has standing to bring this lawsuit, Plaintiff cannot state a claim under the VPPA against AMC because under the facts as pled, she is not a "subscriber" of AMC. Surfing the web and merely watching videos on AMC's free website does not make her a "subscriber," as Plaintiff suggests. Such an expansive interpretation of that term is illogical and wholly inconsistent with its plain meaning, as well as Plaintiff's own authorities.

As an initial matter, the definitions relied upon by Plaintiff (Resp. at 14 n.12) all demonstrate the *primary* and most "commonly understood" meaning of "subscribe"—the meaning used by Congress—is to "[a]rrange to receive something, typically a publication, regularly by paying in advance." *See Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 117 (2d Cir. 2007) (the "ordinary meaning" as it is "commonly understood" should be applied) (quotation omitted). Even putting aside the requirement of payment, these definitions establish

that becoming a subscriber requires an *advanced* agreement, registration, or sign-up process. Indeed, the key word in the definitions relied upon by Plaintiff is "arrange," which means to "[r]each agreement about an action or event *in advance*," *i.e.*, by signing up or contracting for a service.  *E.g.*, http://www.oxforddictionaries.com/definition/english/arrange?q=arrange (emphasis added, last accessed Dec. 22, 2014).  Plaintiff has not alleged that occurred here.

In fact, even the secondary definitions of "subscriber" upon which Plaintiff relies (while ignoring primary definitions cited by AMC) demonstrate that Plaintiff is not a subscriber.  (*See* Resp. at 14-16.)  Her definitions are, at most, consistent with the *Hulu* court's construction of the term (in its earlier ruling), in which a person "[a]rrange[s] for access to an electronic mailing list or online service," by subscribing to the service (Resp. at 14 n.12)—namely, plaintiffs there alleged that they "signed up for a Hulu account, became registered users, received a Hulu ID, established Hulu profiles, and used Hulu's video streaming services."  *In re Hulu Privacy Litig.*, No. C 11-03674 LB, 2012 WL 3282960 at *7 (N.D. Cal. Aug. 10, 2012).

In her attempt to enlarge the meaning of the term "subscriber" to somehow shoehorn herself into the VPPA, Plaintiff misconstrues *Hulu*.  *Id.* at *7-8.  Importantly, the *Hulu* court did not find that the plaintiffs were subscribers merely because they "'visited hulu.com and viewed video content'" as Plaintiff suggests.  (Resp. at 15) (quoting *Hulu*, 2012 WL 3282960, at *8).  Instead, the *Hulu* court specifically held plaintiffs "pleaded more than just visiting Hulu's website" because when plaintiffs "viewed video content" on the Hulu website, Hulu "tracked" their prior data "regardless of whether they were registered and logged in," which included "'Hulu profile identifiers' linked to [plaintiffs'] 'individual Hulu profile pages that included name, location preference designated by the user as private, and Hulu username.'"  *Id.* at *8.  Such information (names, profile pages, user names) would exist only for users who previously

6

signed up with Hulu.[3]  Indeed, the proposed class members in *Hulu* were individuals who were

"*registered* users of hulu.com."  *Hulu*, 2014 WL 2758598, at *2 (N.D. Cal. Feb. 17, 2014)

(emphasis added).  Thus, even under Plaintiff's strained definition, she is not a subscriber here

because she did not sign up, register, or even receive a user ID or profile with AMC.

Even *Ellis v. Cartoon Network*, No. 14-cv-484, 2014 WL 5023535 (N.D. Ga. Oct. 8,

2014), upon which Plaintiff heavily relies, does not support the expansive reading of

"subscriber" that Plaintiff advocates for here.  As an initial matter, the question of whether Ellis

was a "subscriber" to the Cartoon Network was not the focus of the court's decision, as it

dismissed with prejudice on other grounds.  *Id.* at *3-4.  In any event, instead of merely visiting

the Cartoon Network site to watch videos (like Plaintiff did on the AMC site), Ellis downloaded

a Cartoon Network app to his phone.  *Id.* at *2.  On that basis, the court with express reluctance

found that Ellis was "arguably" a subscriber.  *Id.*  Here, Plaintiff has not even done that much.

By her own allegations, she has merely "accessed the [AMC] website while logged-on to her

Facebook account" and "access[ed] and view[ed] video content on the site."  (Resp. at 16.)

Had Congress wanted the VPPA to cover casual viewers of videos on websites like

AMC's it could have crafted the definition of "consumer" to encompass such individuals.  But

Congress did not do that under the VPPA.  Congress, of course, knows how to cover a broader

scope of individuals, as demonstrated by the Electronic Communications Privacy Act ("ECPA"),

18 U.S.C. § 2701, *et seq*.  There, for example, Congress used the terms "customer" and

---

[3] Plaintiff asserts that AMC relies on the *Hulu* court's recitation of plaintiff's argument, instead of the court's ruling.  (Resp. at 15 n.15.)  That is not accurate.  As detailed above, the *Hulu* court's reasoning for finding plaintiffs were subscribers, even without a payment, focused on the fact that Hulu "tracked" and disclosed plaintiffs' "'individual profile pages'" including their "name, location preference . . . and Hulu username."  *Hulu*, at *8.  Hulu had this information because, as plaintiffs alleged, "they signed up for a Hulu account, became registered users, received a Hulu ID, established Hulu profiles."  *Id.* (reciting plaintiff's allegations).

"subscriber" to cover a broader range of users than only "subscribers." *See, e.g.*, 18 U.S.C. §

2702(a)(2). And even then, those terms do not cover all persons involved in an electronic

communication. *See, e.g. Organizacion Jd Ltda. v. U.S. Dep't of Justice*, 124 F.3d 354, 360 (2d

Cir. 1997) ("ECPA, therefore, clearly distinguishes between 'customers' and mere 'persons' or

'individuals' with other types of interests in electronic communications. The language used

throughout the ECPA suggests that 'customer' must be defined narrowly to give effect to this

distinction."). Likewise, the term "subscriber" in the VPPA should not be interpreted to

encompass all individuals who watch free videos on any website that happens to include

Facebook code to enable "liking" and "sharing".

The reality is that while Plaintiff fully acknowledges that she must "plead[] more than

simply visiting a website" to be a "subscriber" under the VPPA (Resp. at 15), that is simply all

she has done. But a "subscriber," as that term is ordinarily understood, means more than just

using or accessing something.[4] Though she creatively tries to use her Facebook activity to

establish her purported status as an AMC website subscriber (*see* Resp. at 16), it is of no

consequence when evaluating whether her actions make her a subscriber of AMC. Here, even

setting aside that there was no payment, there also was no registration or user name or ID

---

[4] Recognizing the weakness of her dubious subscriber allegations, Plaintiff preemptively offers
to amend her complaint with "additional details" regarding her claim. (Resp. at 16 n.14.) As an
initial matter, the details she offers are unpled and therefore improper for the Court to consider in
this motion to dismiss. Nor do they have anything to do with whether Plaintiff's actions make
her a subscriber to AMC. In any event, the proposed new allegations she appears to offer—the
alleged disclosure of anonymous unique identifiers—are the exact type of allegations that
numerous courts have soundly rejected as non-PII under the VPPA. *E.g.*, *Eichenberger v. ESPN,
Inc.*, No. C14-463 TSZ (W.D. Wa. Nov. 24, 2014) (anonymous device serial number not PII
under VPPA); *Ellis*, 2014 WL 5023535 (N.D. Ga. Oct. 8, 2014) (Android ID not PII under
VPPA); *In re Nickelodeon Consumer Privacy Litig.*, MDL 2443, 2014 WL 3012873 (D.N.J. July
2, 2014) (anonymous username, IP address, browser setting, unique device identifier, and
information about the computer and browser used to view the site not PII under the VPPA); *In re
Hulu Privacy Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *12 (N.D. Cal. Apr. 28, 2014)
("unique identifier – without more" is not PII under the VPPA).

established **with AMC**.  Plaintiff does not allege that AMC even knows Plaintiff's name or

identity.[5]  By her own allegations, Plaintiff has no cost, no ties to AMC, no user ID, no

continuing obligation and no repercussions for either using or not using the free AMC website.

In short, Plaintiff's Response confirms she is attempting to cram herself into a statute that just

doesn't fit.  She simply is not a "subscriber" under the VPPA.

**III.    Though Not Before The Court, Plaintiff's VPPA Claim Ultimately Faces Other Fatal Deficiencies.**

In a footnote to its Opening Brief, AMC flagged for the Court two further issues that

would inevitably doom Plaintiff's complaint even if it were allowed to go forward: first, a

Facebook ID is not PII, and second, AMC did not act "knowingly," as required under the VPPA.

AMC was clear that it was not raising these issues as a basis for dismissal—which Plaintiff fully

acknowledged (Resp. at 16)—but apparently Plaintiff felt compelled nonetheless to defensively

address these issues now.

Plaintiff's anticipatory justifications of the viability of her claim serve only to reveal its

vulnerabilities.  First, though Plaintiff relies heavily on the *Hulu* court's reasoning to argue there

is "clear, on-point guidance" that confirms a Facebook ID is PII (Resp. at 17), that is actually not

the case.  While the *Hulu* court recognized that "context" *could* render a Facebook ID the

"equivalent of the identification of a specific person," 2014 WL 1724344, at *11,  *Hulu*

ultimately indicated that an early summary judgment was premature on this issue (and others)

because it was "a fact issue."  *Id.* at *13-14.

---

[5] Plaintiff's claim that "discovery will show" that she possesses "promotional e-mails sent from AMC to her private email address" (Resp. at 14 n.11) does nothing to save her Complaint from dismissal because there is absolutely no connection between this allegation (even if both pled and true) and her VPPA claim of transmission to Facebook—nor even any indication that her email address actually reveals her identity.

Second, Plaintiff's conclusory allegations in this complaint that AMC "knowingly" disclosed PII barely, if at all, pass muster under *Twombly*, as they are devoid of any facts.   In all events, AMC submits that questions of whether a "knowing" violation occurred—or whether a violation occurred at all under Plaintiff's novel theory—will be subject to dismissal at a later stage of this case.  In fact, in *Hulu*, after denying class certification, the court is now reviewing the "knowingly" issue on summary judgment.  Thus, far from these issues being well-settled, as Plaintiff would like this Court to believe, the questions AMC raised are serious hurdles that Plaintiff faces if this case were to move forward.  But, as explained previously, this Court need not even address these issues now (or ever) because Plaintiff's complaint fails for the threshold reason that she is not even a subscriber covered by the statute in the first place.

## CONCLUSION

For all of the foregoing reasons, and those in their Opening Memorandum, Defendants respectfully request this Court to dismiss the Complaint with prejudice.

Dated: December 22, 2014                          Respectfully submitted,

                                                  /s/ Sandra D. Hauser
                                                  *One of the Attorneys for Defendants*

Natalie J. Spears (pro hac vice)          Sandra D. Hauser
Kristen C. Rodriguez (pro hac vice)       DENTONS US LLP
DENTONS US LLP                            1221 Avenue of the Americas
233 S. Wacker Drive, Suite 7800           New York, New York 10020
Chicago, Illinois 60606                   Tel:  (212) 768-6802
Tel:  (312) 876-8000                      Fax:  (212) 768-6800
Fax:  (312) 876-7934                      sandra.hauser@dentons.com
natalie.spears@dentons.com
kristen.rodriguez@dentons.com


83557187\V-10