UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
ETHEL AUSTIN-SPEARMAN, individually
and on behalf of all others
similarly situated,

                Plaintiff,           **MEMORANDUM AND ORDER**

    - against -           14 Civ. 6840 (NRB)

AMC NETWORK ENTERTAINMENT LLC, and
AMC NETWORKS, INC.,

                Defendants.
--------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


      Plaintiff Ethel Austin-Spearman ("Austin-Spearman") commenced this action against defendants AMC Network Entertainment, LLC, and AMC Networks, Inc. (collectively, "AMC"), alleging that AMC disclosed her personal information in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710.  AMC moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Following oral argument on this motion (and presumably anticipating this decision), Austin-Spearman requested leave to amend the complaint to add new factual allegations.  The proposed amendment adds an additional piece of information but leaves intact the Court's analysis of the original complaint.  For the reasons stated herein, AMC's motion is granted, but Austin-Spearman is granted to leave to amend.

**BACKGROUND**

AMC maintains a website that provides information about its television programming, on which it offers video clips and episodes of many of its television shows.  Cmplt. ¶ 11.  Web users may access the website's content either as a guest or by using an existing online account with participating cable television providers.  Id. ¶ 12.

AMC's website also incorporates a software development kit ("SDK") provided by Facebook.  Id. ¶ 23.  This SDK allows companies to add Facebook-related features to their websites: for instance, sites can include a "Facebook Login," which lets visitors log into a website using their Facebook credentials, or a "Facebook Social Plugin," which lets visitors use Facebook's "Like," "Share," and "Comment" functions.  Id. ¶ 15.  To make use of this SDK, a company will add Facebook's source code to its website and then customize that code.  Id. ¶ 17.

Notably, the Facebook SDK relies in part on cookies.  Id. ¶ 18.  In particular, through its "c_user" cookie, Facebook's code allegedly forces a user's web browser to look for the user's Facebook ID.[1]  Meanwhile, if a person has chosen to remain logged into Facebook by checking the "keep me logged in" button on

---

[1] According to Austin-Spearman, this ID (a unique numeric string assigned to a particular Facebook account) "may be inputted into a web browser to view an individual's 'profile' page, thus making it a personal identifier."  Id. ¶ 19.

Facebook's homepage, this "c_user" cookie will continue to operate, regardless of what the user does with the web browser. Id. ¶ 20. If a person then visits a webpage (such as AMC's) that includes Facebook's SDK, Austin-Spearman asserts, "data about the user's web browsing may be silently transmitted back to Facebook." Id. ¶ 21. Specifically, Austin-Spearman alleges that when a user clicks on a hyperlink on AMC's webpage (for example, to view a video clip), Facebook's SDK "initiates a transmission to Facebook called '/plugins/like.php?' which contains values from the 'c_user' cookie and full URL of the video's webpage." Id. ¶ 24. "As a result of these data transmissions, Facebook receives a full record of: (i) the Facebook ID of the visitor browsing AMC's website, along with (ii) the exact titles of the audiovisual material (i.e. the video clips) that they viewed." Id. ¶ 26.

Austin-Spearman has been a member of Facebook since 2007 and remains logged in through her web browser. Id. ¶ 36. Since 2013, she has been visiting the AMC website to, among other things, watch video clips from AMC's The Walking Dead. Id. ¶ 37. She alleges that as she viewed these video clips, AMC disclosed her Facebook ID and the titles of the videos she viewed to Facebook. Id. ¶ 40.

Austin-Spearman filed the present complaint on August 22, 2014. The complaint, a putative class action, contains one cause of action under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. The VPPA provides that "[a] video tape service

3

provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in subsection (d)," 18 U.S.C. § 2710(b)(1), and it specifies that "the term 'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." Id. § 2710(a)(1). AMC moved to dismiss the complaint on October 23, 2014, raising two arguments in support of the motion: first, that Austin-Spearman lacks Article III standing, and second, that Austin-Spearman does not constitute a "subscriber" under the VPPA. The motion was fully briefed on December 22, 2014, and oral argument was held on March 25, 2015.

As noted earlier, after oral argument, on March 27, 2015, Austin-Spearman submitted a letter requesting leave to amend the complaint to add new factual allegations in the event the Court otherwise deemed her complaint inadequate. Below, we address AMC's motion to dismiss the complaint as pled and Austin-Spearman's request for leave to amend in turn.

**DISCUSSION**

## I.  Motion to Dismiss - Legal Standard

"To survive a motion to dismiss for lack of subject-matter jurisdiction based on standing pursuant to Rule 12(b)(1), the plaintiff 'must allege facts that affirmatively and plausibly suggest that it has standing to sue.'"  New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp., 980 F. Supp. 2d 527, 533 (S.D.N.Y. 2013) (quoting Amidax Trading Grp. V. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011)).  Where the defendants place jurisdictional facts in dispute, the court may properly consider "evidence relevant to the jurisdictional question [that] is before the court."  Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001).  However, if the defendants challenge only the legal sufficiency of the jurisdictional allegations, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff."  Id.

Similarly, a court ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009); Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).  A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." Still v. DeBuono, 101 F.3d 888, 891 (2d. Cir. 1996).
Nevertheless, a plaintiff's "[f]actual allegations must be enough
to raise a right of relief above the speculative level." Bell
Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft
v. Iqbal, 556 U.S. 662, 678 (2009). Thus, a plaintiff must allege
"enough facts to state a claim to relief that is plausible on its
face." Twombly, 550 U.S. at 570. If a plaintiff "ha[s] not nudged
[his] claims across the line from conceivable to plausible, [his]
complaint must be dismissed." Id. This pleading standard applies
in "all civil actions." Iqbal, 556 U.S. at 684 (internal quotation
marks omitted).

## II. Motion to Dismiss - Analysis

### A. Article III Standing

AMC first seeks dismissal of the complaint on the ground that
Austin-Spearman lacks standing under Article III to assert her
current claims. To establish Article III standing, a plaintiff
bears the burden of establishing that she has suffered (1) "an
injury in fact, which is an invasion of a legally protected
interest which is (a) concrete and particularized and (b) actual
or imminent, not conjectural or hypothetical;" (2) "a causal
connection between the injury and the conduct complained of;" and
(3) "a likelihood, as opposed to mere speculation, that the injury

will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Here, AMC argues that Austin-Spearman has failed to establish standing because she has failed to allege an "injury in fact" sufficient to satisfy Article III.  According to AMC, Congress cannot create injury and thereby confer constitutional standing "by simply enacting a statute that creates legal obligations to an individual." Def's Br. at 7. As a result, they assert, a plaintiff seeking relief under a statute must plead an injury beyond the statutory violation--i.e., in the context of the VPPA, harm resulting from disclosure rather than simply disclosure itself-- in order to have alleged a constitutionally cognizable injury. Austin-Spearman, who has claimed as harm only disclosure in violation of the statute, would thus have no standing to bring the present action.

AMC's argument, however, fundamentally underestimates Congress's ability to confer standing through statutory enactment. It is true, as AMC proclaims, that Congress "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." Def's Br. at 7 (quoting Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997)). Nevertheless, while Congress cannot confer standing in the absence of an injury, it can "broaden the injuries that can support constitutional standing," Donoghue v. Bulldog Investors Gen.

P'ship, 696 F.3d 170, 179 (2d Cir. 2012), by "creating legal rights, the invasion of which creates standing," id. at 175 (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617 n.3 (1973)). See also Lujan v. Defenders of Wildlife, 504 U.S. 555, 578 (1992) ("Statutory broadening of the categories of injuries that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury.")(internal quotation marks and brackets omitted).   Thus, in evaluating whether a plaintiff alleging a statutory violation has standing, the relevant question is not whether the plaintiff has alleged injury beyond violation of the statute, but rather "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  Warth v. Seldin, 422 U.S. 490, 500 (1975).

The VPPA plainly provides those, like Austin-Spearman, who allege wrongful disclosure even without additional injury a right to relief.  By affording redress to "aggrieved" "consumers" and providing that "consumers" become "aggrieved" purely as a result of disclosures made in violation of the statute, the VPPA makes clear that such disclosures alone work an injury deserving of judicial relief.  See In re Hulu Privacy Litig., No. C 11-03764 LB, 2013 WL 6773794, at *5 (N.D. Cal. Dec. 20, 2013) (holding that "the VPPA requires only injury in the form of a wrongful

disclosure" because "[t]he consumer . . . is 'aggrieved' based solely on the disclosure of personally identifiable information to third parties," "which demonstrates an injury in-fact for Article III standing purposes").  In essence, the VPPA creates a right to the privacy of one's video-watching history, the deprivation of which--through wrongful disclosure, or statutory violation, alone--constitutes an injury sufficient to confer Article III standing.

Notably, every court to have addressed this question has reached the same conclusion, affirming that the VPPA establishes a privacy right sufficient to confer standing through its deprivation. See, e.g., Sterk v. Redbox Automated Retail, LLC, 770 F.3d 618, 623 (7th Cir. 2014) ("Redbox characterizes plaintiffs' claim as an allegation that Redbox committed a 'mere technical violation' of the statute, which Redbox argues is insufficient to establish standing. But 'technical' violations of the statute (i.e., impermissible disclosures of one's sensitive, personal information) are precisely what Congress sought to illegalize by enacting the VPPA. . . . By alleging that Redbox disclosed their personal information in violation of the VPPA, Sterk and Chung have met their burden of demonstrating that they suffered an injury in fact that success in this suit would redress.") (emphasis added) (internal citations omitted); In re Hulu Privacy Litig., 2013 WL 6773794 at *5; In re Nickelodeon Consumer Privacy Litig., No. CIV.A. 12-07829, 2014 WL 3012873, at

9

*3-4 (D.N.J. July 2, 2014); Ellis v. Cartoon Network, Inc., No. 1:14-CV-484-TWT, 2014 WL 5023535, at *2 (N.D. Ga. Oct. 8, 2014).

By contrast, AMC's attempts to devise an additional pleading requirement, and particularly to suggest that such a pleading requirement is compelled by the Second Circuit's decision in Kendall v. Employees Ret. Plan of Avon Products, 561 F.3d 112 (2d Cir. 2009), are unavailing. In Kendall, the plaintiff alleged that the defendant owed a fiduciary duty to execute a pension plan that complied with ERISA and that, in violating ERISA, it had breached this fiduciary duty to her, thereby causing her cognizable injury in fact. The court, however, disagreed, holding that while the ERISA statute does impose a general fiduciary duty of compliance, "it does not confer a right to every plan participant to sue the plan fiduciary for alleged ERISA violations without a showing that they were injured by the alleged breach of the duty." Id. at 120. AMC asks us to construe this decision broadly, arguing that it stands for the expansive proposition that allegations of statutory violations without allegations of additional injury are insufficient to prove standing in the Second Circuit. However, in rejecting the plaintiff's claim, the Kendall court did not reject the principle that Congress can create a legal right, the violation of which alone confers standing; rather, it held simply that the Kendall plaintiff had not alleged an injury sufficient for standing because she had alleged only deprivation of her right to a plan

that complied with ERISA, which, it found, was not a right conferred to her under the ERISA statute. As a result, Kendall does not stand for the broad proposition that a statutory violation cannot confer standing without further injury, but rather requires that plaintiffs allege the specific rights that any statutory violation has infringed. Pl's Br. at 11.

That the Second Circuit does not as a rule require allegations of injury beyond statutory violation is further evidenced by its decision in Donoghue v. Bulldog Investors Gen. P'ship, 696 F.3d 170 (2d Cir. 2012). Finding plaintiff's allegations that the defendants had violated Section 16(b) of the Exchange Act sufficient to afford her standing, the Donoghue court maintained that where a statute creates a specific legal right--there, "one that ma[de] 10% beneficial owners 'constructive trustee[s] of the corporation,' with a fiduciary duty not to engage in short-swing trading of the issuer's stock at the risk of having to remit to the issuer any profits realized from such trading"--deprivation of that right through statutory violation alone suffices for injury warranting standing. See 696 F.3d at 177, 179 ("While this particular legal right might not have existed but for the enactment of § 16(b)," "[t]he deprivation of this right establishes Article III standing."). Moreover, the Donoghue court specifically noted that "this case is distinguishable from Kendall" because, unlike Kendall's breach of fiduciary duty claim, "the fiduciary

11

obligation created by § 16(b) is not general, but rather confers a specific right on issuers." Id. at 178.  Its endorsement of Kendall as requiring only that "a plaintiff [asserting standing] allege some injury or deprivation of a specific right," id. (emphasis added) (internal quotation marks and citations omitted), confirms that, in the Second Circuit, a plaintiff need not allege injury beyond statutory violation so long as the statute at issue bestows on the plaintiff a clear legal right.[2]

Thus, because the VPPA creates a specific right to relief for disclosures made in violation of the statute, a plaintiff asserting claims under the VPPA need only assert that her information was wrongfully disclosed to have asserted an "injury in fact" supporting Article III standing.  Austin-Spearman's allegations that AMC disclosed her personal information in violation of the VPPA, without more, therefore suffice to establish her standing to bring the present claims.

---

[2] The possibility of standing for claims based purely on statutory violations is further supported by Donoghue's treatment of Edwards v. First American Corp., 610 F.3d 514 (9th Cir. 2010).  In Edwards, the Ninth Circuit upheld a plaintiff's standing to sue under the Real Estate Settlement Procedures Act ("RESPA") to recover three times the amount of any charge paid for real estate settlement services provided in violation of RESPA, even though the plaintiff did not and could not allege that the charges were higher than they would have been but for the violation.  Because the court construed RESPA as conferring a legal right to recovery without regard to an overcharge, the Ninth Circuit held that the plaintiff had alleged Article III injury.  The Second Circuit in Donoghue cited Edwards approvingly, noting that "[i]n light of the Supreme Court's dismissal of its writ of certiorari, see – U.S. –, 132 S. Ct. 2536, 183 L.Ed.2d 611 (2012) (dismissing writ as improvidently granted), Edwards remains good law in the Ninth Circuit, and has been cited approvingly in our own." Donoghue, 696 F.3d at 179.

**B. Subscribers under the VPPA**

Having found that Austin-Spearman has standing to bring the present action, we nevertheless dismiss her claims because we find that she does not qualify as a "consumer," and therefore fails to state a claim, under the VPPA.

The VPPA vindicates the rights of the "consumer," a term it defines to include "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). As there has been no argument that Austin-Spearman constitutes either a "renter" or "purchaser" of AMC's services, we evaluate below whether she can nevertheless lay claim to the VPPA's protections through designation as a "subscriber"--a term given no further definition in the statute. In light of the term's plain meaning and its treatment in prior cases, we conclude that Austin-Spearman's allegations fail to establish a relationship with AMC sufficient to characterize her as a "subscriber" of AMC's goods or services.

To ascertain the scope of undefined terms in a statute, we "necessarily begin[] with the plain meaning of a law's text and, absent ambiguity, will generally end there." Dobrova v. Holder, 607 F.3d 297, 301 (2d Cir. 2010) (quoting Bustamante v. Napolitano, 582 F.3d 403, 406 (2d Cir. 2009)). First and foremost, this "plain meaning [is] extrapolated by giving words their ordinary sense." Natural Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 98 (2d

Cir. 2001).  *See also, e.g.*, BP Am. Prod. Co. v. Burton, 549 U.S. 84, 91 (2006) ("Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning."); Garcia v. Teitler, 443 F.3d 202, 207 (2d Cir. 2006) ("It is a basic rule of statutory construction that a court begin with 'the plain and ordinary meaning of statutory terms.'").

Given the allegations in the complaint, Austin-Spearman cannot claim classification as a "subscriber" as that term is ordinarily understood.  Conventionally, "subscription" entails an exchange between subscriber and provider whereby the subscriber imparts money and/or personal information in order to receive a future and recurrent benefit, whether that benefit comprises, for instance, periodical magazines, club membership, cable services, or email updates.  *See, e.g.*, Subscriber Definition, OED.com, http://www.oed.com/view/Entry/192954?redirectedFrom=subscriber#eid (last visited March 25, 2015) ("A person who makes a regular payment in return for entitlement to receive a periodical, membership of a society, access to a commercially provided service."); *id.* ("A person who adds his or her details to an electronic newsgroup, mailing list, etc., in order to receive, or contribute to, its contents . . . ."); Subscription Definition, Merriam-Webster.com,    http://www.merriamwebster.com/dictionary/subscription (last visited March 25, 2015) ("[A]n arrangement for providing, receiving, or making use of something of a continuing

or periodic nature on a prepayment plan."); id. (providing as examples of usage, "Subscribe today and get your first issue free!" and "You'll receive a user name and password when you subscribe.").

Whatever the nature of the specific exchange, what remains is the subscriber's deliberate and durable affiliation with the provider: whether or not for payment, these arrangements necessarily require some sort of ongoing relationship between provider and subscriber, one generally undertaken in advance and by affirmative action on the part of the subscriber, so as to supply the provider with sufficient personal information to establish the relationship and exchange.[3]

Austin-Spearman, however, does not claim any such relationship with AMC in her complaint. According to the complaint, she did not pay AMC for the content on its free website, nor did she "sign up," register for an account, establish a user ID or profile, download an app or program, or take any action to associate herself with AMC. Her visits to AMC's website to view various videos--visits that, AMC notes, Austin-Spearman does not allege were regular or even periodic--evince no desire to forge

---

[3] Indeed, even older or less common usages of "subscription" turn on the subscriber's intentional association with the thing subscribed to, reinforcing that such affirmative affiliation--notably absent here--is at the core of the term's meaning. See Subscribe Definition, Merriam-Webster.com, http://www.merriamwebster.com/dictionary/subscribe (last visited March 25, 2015) (listing as definitions "to write (one's name) underneath," "to sign (as a document) with one's own hand in token of consent or obligation," "to attest by signing," and "to assent to; support").

ties with, and need not have in any way tied her to, AMC; as AMC observes, Austin-Spearman "can decide to never visit the AMC website ever again--and that decision will have zero consequences, costs, or further obligations."  Def's Br. at 13.  Such casual consumption of web content, without any attempt to affiliate with or connect to the provider, exhibits none of the critical characteristics of "subscription" and therefore does not suffice to render Austin-Spearman a "subscriber" of AMC.

Exclusion of Austin-Spearman from the "subscribers" intended by the statute is also supported by the two cases to have thus far considered the meaning of the term.  In In re Hulu Privacy Litig., No. C 11-03764 LB, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012), the court found plaintiffs to be subscribers where they "signed up for a Hulu account [to watch videos], became registered users, received a Hulu ID, established Hulu profiles, and used Hulu's video streaming services," at which point "Hulu gave [a third party] Plaintiffs' 'Hulu profile identifiers' linked to their 'individual Hulu profile pages that included name, location preference information designated by the user as private, and Hulu username."[4]

---

[4] We note that the Hulu court, while finding that plaintiffs constituted "subscribers" under the VPPA, recently granted summary judgment to Hulu on the ground that"there is no evidence that Hulu knew that Facebook might combine a Facebook user's identity (contained in the c_user cookie) with the watch-page address to yield 'personally identifiable information' under the VPPA," and therefore "no proof that Hulu knowingly disclosed any user 'as having requested or obtained specific video materials or services'" as required by the VPPA.  In re Hulu Privacy Litigation, 11-03764 (LB), slip op. at 10 (N.D. Cal. Mar. 31, 2015).

Similarly, in Ellis v. Cartoon Network, Inc., No. 1:14-CV-484-TWT, 2014 WL 5023535 (N.D. Ga. Oct. 8, 2014), the court found the plaintiff's allegations that he "downloaded the [Cartoon Network] App and used it to watch video clips," necessarily tying himself to the provider by incorporating its program into his device, sufficient to allege subscription. Thus, despite disparities in their manner of association with the provider, in both cases plaintiffs engaged in an ongoing relationship with the provider initiated by the plaintiffs' own actions. Thus, these two cases affirm that this relationship stands at the core of the definition of "subscriber" under the VPPA--and that Austin-Spearman's failure to allege such a relationship is ultimately fatal to her claim.

The definition advanced by Austin-Spearman, on the other hand, lacks any meaningful limitation. Austin-Spearman argues that the threshold for subscription under both the statute and the existing case law is merely "plead[ing] more than simply visiting a website," and that such a threshold was met here by her use of AMC's streaming services: according to Austin-Spearman, such "activity on the website provided Defendants with access to the cookies installed on her computer, which Defendants' source code thereafter used to collect and transmit information about her website activity." Pl's Br. at 16. In essence, then, Austin-Spearman suggests that so long as the provider has been able to access a user's information, the protections of the VPPA should

apply, and whatever the user has done to enable such access (here, simply browsing while logged onto Facebook) is thereby sufficient to render her a subscriber.  Such a definition, however, sweeps so broadly as to be effectively limitless: by essentially turning "subscription" into a mere proxy for whether the provider has received access to personal information, this definition all but writes out the statute's limitation to "consumers," as the requirement that the provider have disclosed personal information necessarily presupposes that it gained access to such information, therefore rendering the "consumer" clause superfluous.  As "[i]t is well-settled that courts should avoid statutory interpretations that render provisions superfluous," we reject this reading.[5] State St. Bank & Trust Co. v. Salovaara, 326 F.3d 130, 139 (2d Cir. 2003) ("'It is our duty to give effect, if possible, to every clause and word of a statute.'") (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)).  Rather, an individual must do more than simply take advantage of a provided service--even if doing so alone

---

[5] Plaintiff's suggestion that such an expansive definition is necessary to further the statute's aims in light of technological advancements unimagined at the time of enactment, and to afford protection to plaintiffs who would have been intended had such technology then existed, is likewise unavailing. This argument ignores the fact that comparable situations, in which an individual used services and, in so doing, granted a provider access to her personal information, but would not have been considered a "subscriber," existed even in 1988.  For example, an individual who watched (but did not check out) a video at a library after leaving an ID card at the front desk as security, or an individual who attended a free showing of a film but was asked to sign in at the entrance would, like Austin-Spearman, have interacted with the provider in such a way as to enable the provider to make disclosures in violation of the VPPA, but would not have fallen under the ordinary definition of "subscriber" at the time.

allows a provider to access her information--in order to have acted as a "subscriber" of the provider.

Consequently, we find that Austin-Spearman has not alleged a relationship with AMC sufficient to render her a "consumer," and we therefore dismiss her complaint for failure to state a cause of action under the VPPA.

**C. Leave to Amend**

In a letter dated March 27, 2015, Austin-Spearman informed the Court of a fact she deems relevant to her classification as a "subscriber" which, although evidently known at the time she filed her opposition papers, was inexplicably not shared with the Court or the defendant either during briefing or at oral argument. Specifically, Austin-Spearman now claims that she "registered for AMC's newsletter as it relates to the Walking Dead TV show, providing certain personal information, including her email address," and that she subsequently received promotional emails regarding the show, including a link to "unsubscribe" should she choose to do so. Pl's 3/27 Ltr. at 1. Having failed to plead any of these details in her complaint, Austin-Spearman now requests that we grant her leave to amend to add these new allegations rather than dismiss her complaint with prejudice.

Regrettably, as the law regarding leave to amend is very forgiving, see Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002) ("Leave to amend should be freely granted [unless] there

is a good reason for [denying] it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party"), we must grant Austin-Spearman's request. Nevertheless, we do so with great reluctance, not only because it is beyond comprehension that such information should only be disclosed after both full briefing and oral argument on the present motion to dismiss, thereby wasting both the Court's and defendants' time and resources, but also because we remain skeptical that Austin-Spearman will be able to state a claim even after amendment. In particular, we note that Austin-Spearman's proposed amendment raises a host of troubling questions and implications, such as: whether a plaintiff can constitute a subscriber under the VPPA if she subscribes only to a portion of the provider's services that are distinct and set apart from its provision of videos; whether it is reasonable to read the statute as creating liability for a provider which itself collects data only from that distinct, non-video-related subscription; whether, if plaintiff can be deemed a subscriber purely on the basis of her newsletter subscription, she has consented to the privacy policy that one must accept before subscribing to AMC's newsletter, which makes it clear that AMC will collect data and allow third-party cookies; and whether such consent would serve to preclude her claims. Thus, while the proposed factual allegation raises an additional issue which should considered in evaluating whether she can now be deemed a

"subscriber" and therefore cannot be dismissed as futile, it remains far from apparent that Austin-Spearman will ultimately be able to satisfy this or the numerous other requirements under the statute. We therefore reluctantly grant Austin-Spearman's request for leave to amend.

## CONCLUSION

For the aforementioned reasons, AMC's motion to dismiss is granted, but Austin-Spearman is granted leave to amend. This Memorandum and Order resolves Docket No. 17.

**SO ORDERED.**

Dated:     New York, New York
           April 7, 2015

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

21

Copies of the foregoing Memorandum & Order have been mailed on this date to the following:

**Attorneys for Lead Plaintiff**
Matthew Wurgaft, Esq.
Kravis & File, P.C.
1 Meadowlands Plaza, Suite 200
East Rutherford, NY 07073

Rafey S. Balabanian, Esq.
Benjamin S. Thomassen, Esq.
Alicia E. Hwang, Esq.
Edelson PC
350 North LaSalle Street, Suite 1300
Chicago, IL 60655

**Attorneys for Defendants**
Sandra D. Hauser, Esq.
Natalie J. Spears, Esq.
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020